UNITED STATES, Appellee

v.

JAMES R. BURKE, Private First Class, U. S. Marine Corps Reserve, Appellant

5 USCMA 56, 17 CMR 56

No. 4691

Decided October 15, 1954

MAJ Charles J. McCaffrey, USMCR, for Appellant.
CDR Raymond W. Glasgow, USN, and MAJ Charles B. Guy, USMC, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried under two separate specifications for offenses in violation of Article 113 of the Uniform Code of Military Justice, 50 USC § 707. The first specification charged that he was found sleeping on post after having been duly posted. The second specification alleged that he was drunk on duty. The court-martial returned a finding of not guilty on the latter offense so we can eliminate it from any further discussion. The conviction on the first charge resulted in a sentence of dishonorable discharge, forfeiture of $40.00 per month for 24 months, reduction to the grade of Private, and confinement at hard labor for two years. The members of the court-martial recommended clemency and the convening authority, pursuant thereto, reduced the period of forfeitures and confinement to ten months and substituted a suspended bad-conduct discharge for the dishonorable discharge.

We granted the petition for review to determine whether or not the evidence was sufficient to sustain the findings. That question breaks down into two parts which, for convenience, we discuss in what might be considered the reverse order. First, is the evidence sufficient to prove beyond a reasonable doubt that accused was sleeping while on duty? Second, is it qualitatively and quantitatively sufficient to show he was duly posted as a sentinel? In making our statement of facts, we will combine those common to both questions with those applicable to the first, and then relate those which have particular significance to the second.

Accused was a member of the First Marine Aircraft Wing, Fleet Marine Force, stationed at K–3 Air Base, Bohang, Korea. On July 14, 1953, he had completed 29 days of a 30-day tour of guard duty with his last remaining watch being scheduled between the hours of 2:00 a.m. and 6:00 a.m. on the following morning. After the evening meal on July 14, 1953, he proceeded to the Enlisted Men's Club and consumed four to five cans of beer. Upon completion of his social activities he returned to his tent and, without undressing, fell asleep on his bunk. At about 1:00 a.m. on July 15, 1953, he was awakened and along with other members reported for guard muster in front of the guard hut. His position in ranks is the subject of dispute, some witnesses placing him in the first rank, others stating he was in the third rank. The corporal of the guard called the roll by post number and each man, when his assigned post was called, answered with his name. The officer of the day reviewed the guard to the extent of observing all men present and then instructed them as to their duties. One of the instructions given at that time was to the effect that if any member needed relief or help, he was to fire a round in the air or to call for the corporal of the guard. The officer then asked if there was anyone present who felt unable to perform his duties on the detail. The accused did not respond to that inquiry. The muster formation was then dismissed and the men were loaded into trucks. The name of each man was called as he mounted the truck, and again accused answered to his name when it was announced. When the particular truck carrying the accused arrived at Post No. 8, he dismounted and the standard procedure for posting a guard was carried out by the corporal of the guard. This required the sentry being relieved to report all was in order. When this report was made, the corporal asked the accused if he had any questions concerning his duties or their performance. He responded by asking the corporal of the guard who the officer of the day was and the corporal replied that he was Captain Chaney. The corporal then left the accused and continued to post the remaining sentries. During the posting of the accused, the corporal suspected that the accused had been

drinking and that he was not entirely fit to perform his duties. He thereupon decided to relieve his as soon as he could get one of the supernumeraries from the guard hut and return to that post.

Pressing duties detained the corporal longer than expected and it was about one hour and twenty minutes before he returned with a relief for the accused. He approached the post in a weapons carrier and its lights illuminated the confines of the post. He made a hurried search of the area but was unable to spot a sentry. He thereupon returned to the guard hut and informed the officer of the day that the sentry was missing. The officer of the day, accompanied by a supernumerary, drove to the post to check on the corporal's report. During the search they found the accused in a state of repose.

We encounter little difficulty in ascertaining that the foregoing facts, together with those we hereafter relate, are adequate to sustain a finding that the accused was asleep. After a short search of the area encompassed within the post, the officer and the supernumerary found the accused sitting on the ground with his back against the fence. He was oblivious to their arrival. The officer flashed the light of his battle lantern on him, noticed his eyes were closed, requested the supernumerary to observe the position of the eyelids, secured the accused's rifle, which was leaning against the fence, and called out in a loud voice to awaken him. The two men had approached the area in a one-quarter ton truck and their movement toward the accused was neither silent nor stealthy. The lights of the jeep were focused generally along the path to be traversed by the accused and it was necessary to drive the truck through a wash and up a very substantial slope. This resulted in considerable noise. The vehicle was stopped, the two men dismounted and walked along the sentry trail. They proceeded unchallenged and saw no sign of the accused until they came upon him in a sitting position. When the accused was awakened by the officer, he stood up in a rather confused manner and stated: "Take it easy, don't get shook, okay, okay."

The sufficiency of the evidence to sustain a finding that the accused was posted properly poses a more substantial question.

There is no dispute about the following facts: That accused knew he was to perform the duties of a sentry between the hours of 2:00 a.m. and 6:00 a.m. on July 15, 1953; that he appeared for guard muster; that he was present in ranks and failed to notify the officer of the day that he was unable to perform guard duty; that he was driven to his post; that he made no complaint to the corporal when he was questioned by the corporal at the time relief was effected; and that he assumed the duties of a sentry on a post. The difficulty, if any, arises over the physical and mental condition of the accused. It is noted that he was charged with being drunk on post and while the evidence would not support a finding on that charge, it established that he had been drinking. The most that appears in the record to support his contention that his conviction cannot be sustained is testimony to the effect that he was sick immediately prior to the time he was posted. This evidence was supplied by four members of the guard who testified, in substance, as follows:

Sergeant Steele, accused's platoon sergeant, testified that accused was sick in ranks at the muster; that accused was in the last of three ranks; that he examined all the men in the platoon at that muster; that accused did not answer the roll; that he informed Corporal Klein that accused was unfit to be posted; that accused was not drunk, but seemed as if he were not awake or was sick; that accused staggered from ranks to the truck; that it took four men pushing from below to help accused onto the truck; and that he smelled no alcohol on accused's breath.

Accused's squad leader was one Sergeant Truman. He testified that the muster was on time and was orderly; that he did not have opportunity to notice accused although accused was in his squad; that his squad was in the front rank; that the sergeant of the guard was present at the muster; and that he heard Sergeant Steele tell Cor-

**59**

poral Klein that accused was unfit for duty.

Private First Class Landeros furnished the following evidence: he was in the second rank, directly behind accused; the formation was late and disorderly; the accused appeared sick; he heard the remark from Steele to Klein concerning accused's condition; he was not inspected during the muster by anyone; he smelled no odor of alcohol on accused; accused was the last one to board the truck and was assisted from above by men in the truck; and accused fell to the ground in attempting to dismount from the vehicle.

Corporal Kuhr related his version which in substance disclosed that he was a tent mate of the accused's; he was present in the tent on the evening of July 14, 1953; the accused came in the tent about 8:00 p.m. and retired with his clothes on; accused looked tired but was not drunk and made no complaint about his physical condition; he, Kuhr, assembled in the formation in the same rank as accused; he did not notice accused while they were at muster; he did not smell the odor of liquor on accused's breath when he awakened him; and he did not hear anyone state that accused was unfit to stand guard.

In opposition to this testimony, we find the following in the record: Immediately after accused was relieved he was taken to the dispensary for a physical examination. He was there examined by a Lieutenant of the Medical Corps who testified that he examined the accused for the purpose of determining his physical condition; that accused made no statement that he was or had been sick and that he did not report to the sick bay at any time thereafter; that from his examination he concluded accused was fit for military duty and that although he was somewhat under the influence of alcohol, he was not intoxicated; and that when asked if he was sleeping on the post, accused stated he could not remember.

The officer of the day testified that he inspected the guard detail from a position outside the ranks; that he was able to observe all of the men; that he requested information from them as to

whether any one believed he could not perform the duties of the guard and informed them that in the event of any difficulty they should fire a round from their weapon or call for the corporal of the guard; that he did not notice accused was unfit for guard duty; that after awakening the accused, he directed the rays of the battle lantern toward the vehicle and the accused walked some fifty feet to reach it without difficulty; that after he secured the weapon and the accused was awakened, the accused asked him if his weapon would be returned to him; that after returning to the guard shack, confinement and sobriety test papers were made out by him and the accused was sent to the sick bay for a sobriety test; and that accused made no mention of being ill.

The corporal of the guard testified that he held muster for the 2:00 a.m. relief on July 15, 1953; that no one stated he was unfit for duty; that the accused rode in a truck to Post No. 8; that upon arrival at the post the corporal dismounted, and called the post number; that the accused dismounted, proceeded to the sentry who was being relieved, and acknowledged his report; that he asked the accused if he had any questions and accused requested information as to who was the officer of the day; that when the accused dismounted from the vehicle he did not look like a normal sentry; that he appeared in a fairly happy mood, like he had had a couple of drinks and as if he might be under the influence of liquor; that he informed his duty driver that he would get a relief for the accused when he got back to the guard hut; that when he returned for a supernumerary he was required to perform other duties; and that he did not return to Post No. 8 as soon as he had anticipated. When pressed for an answer as to the reasons why he believed the accused was unfit for duty, he replied that accused appeared to be intoxicated but he was not drunk.

Staff Sergeant Nussbaumer testified that he accompanied the accused from the guard hut to the dispensary; that he was driving the vehicle and the accused was sitting alongside of him; that he did not notice anything unusual about

the accused; that he observed the physical examination given by the doctor; and that the accused was able to perform the test prescribed.

The accused elected to testify in his own behalf. He related the following version: After eating supper at about 4:30 p.m. he proceeded to the Enlisted Men's Club; while there he consumed from four to five cans of beer; at 7:30 p.m. he concluded to return to his quarters; as he started to leave he met a friend and spent about fifteen minutes talking to him; he then proceeded to his hut and fell asleep on his bunk without undressing; he was tired, but suffered no other ailment; he did not remember being awakened but he recalled looking for his cap before he departed for muster; he had no recollection of any other event until he remembered falling off the truck; after that incident he again had a lapse of memory and his next recollection was of standing up with the lights of the jeep in his face; he recalled walking along a path near a fence, but was not conscious that he was on post; he recalled the officer of the day notifying him he was relieved from duty, and at that time he did not feel very well; he felt dizzy and sick at the stomach; he realized what was going on at the guard hut after being relieved and recalled in detail the examination given him by the medical officer; he did not inform the officer that he was ill; quite often he had been subject to spells of forgetfulness; he never solicited medical attention for his condition; he recalled he was not drunk that evening; while he remained ill until late afternoon of the day he was relieved, he worked filling sandbags and he made no complaint to anyone about his illness.

We can brush aside the unimportant inconsistencies found in the testimony of the various witnesses and obtain from the remaining evidence a rather clear picture of what actually transpired in this case. It appears with reasonable certainty that accused had been doing some drinking early in the evening of July 14, 1953. When he reported for duty he was still under the influence of the intoxicating ingredients he had consumed and he was not in the best of physical condition to perform the task required of a sentinel. All witnesses are in substantial agreement on those facts, and they all reach the conclusion that he was not drunk. While some of them characterize his actions as being those of a sick man, it is apparent they were describing a person affected by intoxicants. Undoubtedly his sleep was induced, in part, by his previous imbibing, but the record does not disclose that his degree of inebriation was such that he was not mentally responsible for his misbehavior. In spite of his claimed loss of memory (alcoholic amnesia), his behavior pattern was that of a marine who was conscious of his acts at the time they were performed. After having been awakened, he located part of his clothing and his weapon. Without guidance or help he reported to the guard tent in time to stand formation, took his proper place in rank, answered to his name, created no disturbance, and remained silent when he was afforded an opportunity to speak. He conversed with the guard he relieved, received the report, understood the questions asked by the corporal, and requested information as to who would be the officer in charge of the guard. After being awakened and relieved from his post of duty, he recalled the incidents in the guard shack. He was able to perform satisfactorily the acts required by sobriety tests and while he may have been pungent with the odor of liquor, he was able to control his thoughts. His physical coordination met the necessary standards and he made no complaint of any illness to the doctor prior to or at the time he was being examined. He performed manual labor the next day without protest or complaint. He had been on guard for some 29 days and he does not contend he was unfamiliar with the unit's operating procedure which permitted a signal either by shot or voice if relief was necessary. The guard book indicates that another member of the guard fired his weapon on the evening in question and requested relief from his assignment when he felt he could not continue on because of being sleepy. In summation of the evidence, we find it discloses the posting of a

guard who outwardly gave some indication of being under the influence of liquor. His intoxication, however, had not reached such a degree that his superiors should be charged with notice, as a matter of law, that he could neither perform his task nor make known his inability to perform his duties. The same degree of intoxication would not be a defense had the posting noncommissioned officer been unaware of the condition, and his error in judgment does not exonerate the accused. Under those circumstances, we affirm the finding of the court-martial.

While we affirm the conviction, we do not commend the practice. The corporal apparently had reasons to believe that the accused was not in a condition to complete his tour of duty and that he ought to have been relieved at the earliest practicable time. Under those circumstances it would have been better judgment to have allowed the relieved sentry to remain on duty until a supernumerary could have been obtained. We, of course, understand the record may not develop fully the collateral matters which may have influenced the decision made by the noncommissioned officer. We mention these matters because we desire to announce that we would not affirm a conviction based on facts which indicate that military authorities placed a drunken person on duty as a sentry and then prosecuted him for his condition. However, there are occasions when an officer in charge may be unable to ascertain the true mental and physical condition of a sentry, and, if the record discloses only failure to fully appreciate the sentry's true state of intoxication, a guard corporal's conduct cannot be used to exculpate the offense. Voluntary intoxication, not amounting to legal insanity, is not a defense and when, as in this case, a court-martial could find the mental and physical condition of a sentry was such that the posting officer was not charged with notice that the sentinel could not perform his duties, the evidence is sufficient to sustain the finding of guilty.

Winthrop in his Military Law and Precedents, 2d ed., 1920 Reprint, page 617, has this to say with respect to

defenses or to an extenuation of offenses of sentinels:

"It has been held no *defence* to a charge of 'sleeping on post' that the accused was on guard the day previous; or that an imperfect discipline had prevailed in the command and similar offences had been allowed to pass without notice; or that the accused was not duly posted as a sentinel; or that he was ill, since, if really so, he should not have gone on duty at all but duly reported for medical treatment. So, to a charge of 'leaving post before being regularly relieved,' it has been held no defence that it was a custom in the command for sentinels to relieve themselves, and that the accused had but followed this custom.

"Circumstances, however, which could not constitute a legal *defence,* may be admissible as evidence going to *extenuate* the offence committed and reduce the measure of the punishment, or to induce a mitigation of the punishment, after sentence, by the reviewing authority. Thus it may be shown that the accused, when posted as a sentinel, was ailing or disabled. . . ."

That the evidence introduced on behalf of the accused was used by members of the court-martial for extenuating purposes is made certain by the sentence and recommendation for clemency in this case. The accused was originally sentenced to be reduced to the grade of private, to be dishonorably discharged from the service, to forfeit $40.00 per month for 24 months, and to be confined at hard labor for two years. The members of the court forwarded a recommendation for clemency to the convening authority, who lessened the punishment. He approved only the bad-conduct discharge, confinement at hard labor for a period of ten months, reduction to the grade of private, and forfeiture of $40.00 per month during the period of confinement. He further suspended the bad-conduct discharge and provided it would be remitted if, during the period of confinement and six months thereafter, the accused conducted himself according to the customs of the service.

The decision of the board of review is affirmed.

Judge BROSMAN concurs.

Chief Judge QUINN dissents.